UNITED STATES OF AMERICA
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 03-10390-DPW

UNITED STATES OF AMERICA

V.

JAMES PEEBLES

DEFENDANT'S MOTION IN LIMINE

Now comes the defendant and moves this Honorable Court to enter the following orders:

1    At trial, the government may make reference only to the gun which Mr. Eddie Powell claims he obtained from the defendant.  The government may not mention any other gun.

2    Prior to trial Mr. Eddie Powell, if he does not have an attorney, shall have an attorney appointed for purposes of a colloquy regarding the fact that his anticipated testimony will consist of an admission to a violation of M.G.L. c. 272, § 99(C)(1).

3    Prior to trial Mr. Eddie Powell, while represented by counsel, shall be advised by the Court that his anticipated testimony will include an admission that on October 23, 2003, he violated M.G.L. c. 272, § 99(C)(1) and that such admission can be used to prosecute him in a Massachusetts state court.  Further, Mr. Eddie Powell shall be advised that if convicted of violating M.G.L. c. 272, § 99(C)(1) he

could be punished for up to five years in the Massachusetts
State Prison.

4    The only portion of the conversation between Mr. Eddie
Powell and the defendant, which was secretly recorded by
Mr. Eddie Powell and agents of the U.S. Department of
Alcohol, Tobacco and Firearms [ATF] on October 23, 2003,
which the government shall reference during trial shall be
the portion which is transcribed at pages 16 through 18 of
the government's transcript, excluding the first eight
lines of page sixteen and the last four lines of page
eighteen.

**Argument in Support of Motion:**

**1.    References to Guns.**

The defendant has been indicted for violating 18 U.S.C.,
§922(a)(1)(A).  He is accused of wilfully engaging in the
business of dealing in firearms, "including ... [eighteen
specific firearms]."

The government intends to present evidence that Cedric
Golston, while at several Ohio gun shows, purchased the eighteen
firearms listed in the indictment.  The government's cooperating
witness, Mr. Eddie Powell who has received consideration for
cooperating with the government and expects further
consideration for his testimony in this trial, will testify that
the defendant transferred one of the eighteen firearms purchased

by Mr. Golston to Mr. Eddie Powell.  There will be no other
evidence relating to the transfer of any of the eighteen
firearms, including the firearm which Powell claims the
defendant transferred to him.[1]

The government will present evidence that five of the
eighteen firearms listed in the indictment were seized by the
Boston Police from persons other than Mr. Golston, Mr. Powell or
the defendant.  The government will not present any evidence
which establishes a link between the defendant and the transfer
of any firearm other than the firearm which Mr. Powell will
claim he obtained from the defendant.  Instead, the government
will ask the jury to speculate that since Mr. Powell claims that

---

[1]       Interestingly, Mr. Powell did not accuse the
defendant of providing him with the firearm – which was
seized from him by the Boston Police on December 27, 2001 –
when he was arrested by the Boston Police in December 2001.
Mr. Powell first started making allegations against Mr.
Peebles as part of a cooperation agreement.  He entered into
a cooperation agreement after ATF agents raided his home and
seized firearms and ammunition On March 14, 2003.  In return
for his cooperation in the instant case, Mr. Powell has not
been charged with any crime with respect to the March 2003
ATF raid and firearms seizure.

The government claims that there are no reports or
investigators notes which indicate what Mr. Powell allegedly
said about Mr. Peebles or when he stated that he obtained a
firearm from Mr. Peebles.  Accordingly, based on a fair
interpretation of the discovery which has been supplied, Mr.
Powell did not implicate Mr. Peebles until sometime around
October 2003.  Coincidently, right when the ATF and Milton
Police were trying to pressure Mr. Peebles into testifying
in a murder trial.

he obtained from the defendant one of the eighteen firearms
purchased by Mr. Golston, the defendant must have disbursed the
other firearms.  The government will present no evidence
concerning the whereabouts of twelve of the eighteen firearms
listed in the indictment.

There should be no reference to any of the seventeen
firearms not specifically linked to the defendant because that
evidence is not relevant pursuant to Fed.R.Evid. 401.  Evidence
concerning the seventeen challenged firearms does not support
the existence of any fact that is of consequence to the
determination of the action.  The fact that Golston purchased
seventeen firearms, which will not be linked to Mr. Peebles,
does not make it more probable or less probable that Peebles
violated § 922(a)(1)(A) than it would be without the evidence.
Pursuant to Fed.R.Evid. 402 the irrelevant evidence is not
admissible.

The defendant has been indicted for engaging in the
business of dealing in firearms without a license.  If a person
has guns on hand or is ready and able to procure them, that
person is engaged in the business of dealing in firearms.
United States v. Breier, 813 F.2d 212, 213-14 & n. 1 (9th
Cir.1987), citing U.S. v. Wilmoth, 636 F.2d 123, 125 (5th Cir.
Unit A 1981); see Bryan v. United States, 524 U.S. 184, 189 n. 5
(a dealer in firearms devotes time, attention, and labor to

dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms).  The defendant has been able to locate only one (an unreported case) in which a person was found to be engaged in the business of dealing firearms based on one transaction.  <u>United States v. Shan</u>, 80 Fed.Appx. 31, 32, 2003 WL 22442983 p.1 (9th Cir. (N. Mariana Island) 2003).  But in <u>Shan</u>, the court found that the government presented evidence of Shan's ability and willingness to procure additional firearms for the Government's informant.  Although the Government provided evidence of the sale of weapons -- arguably in only one transaction -- it also submitted evidence of Shan's disposition as a person "ready and able to procure" additional weapons.  <u>Id</u>.

The government in the instant case will not demonstrate whether twelve of the eighteen firearms listed in the indictment ever left Ohio.  There whereabout are unknown.  There will be no evidence offered concerning what happened to the firearms after Mr. Golston purchased them in Ohio.  Six of the eighteen firearms were recovered by the Boston Police but only one, the Powell gun, will be linked to Mr. Peebles.

The link of the defendant to the Powell firearm is based solely on Powell's 2003 statement, which was induced by the government's agreement not to prosecute Powell as a felon in

possession of a firearm (as prohibited by 18 U.S.C., § 922(g)). Powell, who has served a five year Massachusetts State Prison sentence for illegally carrying a dangerous weapon, claimed in October 2003 that prior to December 2001 he obtained from Peebles one of the eighteen firearms purchased by Golston.

The government desires to reference all eighteen firearms during trial with the intent of scaring the jury so that it will want to convict someone of a firearms violation. Since Mr. Peebles is the only person who will be on trial, there is a great risk that he will be convicted solely on the basis that the jury will be informed that six guns originally purchased by Mr. Golston were seized by the Boston Police and that twelve guns originally purchased by Mr. Golston are unaccounted for. Such a trial would not be fair. Permitting the government to reference the seventeen firearms, which the government cannot link to Mr. Peebles, simply because they were purchased by Mr. Golston will be a violation of Fed.R.Evid. 402 and Mr. Peebles' rights pursuant to the Sixth Amendment to the United States Constitution.

**2.    Powell's violation of M.G.L. c. 272, § 99(C)(1).**

On October 23, 2003, Mr. Eddie Powell agreed to wear a electronic voice intercepting device [a wire] for purposes of intercepting and recording a conversation he intended to have with the defendant. Based on the discovery supplied to the

defendant, Mr. Powell agreed to wear a wire at the request of ATF agents investigating the defendant.  On October 23, 2003, Mr. Powell was not an ATF agent nor was he an investigative or law enforcement officer as per M.G.L. c. 272, § 99(B)(8) and c. 272, § 99(D)(1)(c).  On October 23, 2003, Mr. Powell intercepted the oral communications between himself and the defendant while they were discussing numerous subjects over the course of twenty to thirty minutes.

Except as otherwise specifically provided in section 99 of M.G.L. c. 272, any person who willfully commits an interception or attempts to commit an interception of any wire or oral communication shall be fined not more than ten thousand dollars or imprisoned in the state prison for not more than five years or imprisoned in a jail or house of correction for not more than two and one half years.  M.G.L. c. 272, § 99(C)(1), see Commonwealth v. Barboza, 54 Mass.App.Ct. 99, 103-105 (2002)(it is illegal for a private citizen to secretly record conversations).  It shall not be a violation of section 99(C)(1) for investigative and law enforcement officers of the United States of America to violate the provision of this section if acting pursuant to authority of the laws of the United States and within the scope of their authority.  M.G.L. c. 272, § 99(D)((1)(c).  It is not an interception for an investigative or law enforcement officer to record or transmit a wire or oral

communication if the officer is a party to such communication or has been given prior authorization to record or transmit the communication by such a party and if recorded or transmitted in the course of an investigation of a designated offense as defined in M.G.L. c. 272, § 99B.  M.G.L. c. 272, § 99(B)(4). Firearms offenses are not a designated offense.  M.G.L. c. 272, § 99(B)(7).  Unlike many of its counterparts in other States, or the Federal wiretap statute, the Massachusetts wiretap statute requires both parties to consent to the recording of telephone calls for the recording to be legal.  Commonwealth v. Hyde, 434 Mass. 594, 599 (2001).

There is no dispute that Mr. Powell, on October 23, 2003, was not an investigative or law enforcement officer of the United States.  Specifically, Mr. Powell's ATF Informant Agreement, at paragraph 7, states "While I will be working closely with ATF for purposes of this investigation, I understand that I am not a law enforcement officer, an employee, or agent of ATF and that I will not hold myself out to be such." Accordingly, if Mr. Powell testifies at trial and truthfully acknowledges that on October 23, 2003, he wore a wire and intercepted the oral communications between himself and the defendant, he will be admitting to a violation of M.G.L. c. 272, § 99(C)(1).  He will be exposing himself to possibly being sent to state prison in Massachusetts for up to five years.

It is appropriate to inquire whether a witness, whose testimony my expose the witness to criminal liability, should be advised of the ramifications of his or her testimony.  <u>United States v. Ahern</u>, 68 Fed.Appx. 209, 214-215 (1st Cir. 2003) (2003 WL 21649642, pp. 2-3) Accordingly, before Mr. Powell testifies at trial he should have the benefit of counsel and determine whether he wishes to invoke his Fifth Amendment right to refrain from incriminating himself.

**3.    The Admissible Portions of the Conversation.**

The defendant and Mr. Powell had a twenty to thirty minute conversation on October 23, 2003.  The parties discussed many topics.  The topics discussed by the parties included girls, the defendant's then pending criminal indictment in the Norfolk Superior Court (along with mutual friends' related murder indictments), football, cars and guns.  The conversation was replete with street slang, including crude language.

The only portion of the conversation which, at all, relates to the pending indictment was transcribed at pages 16 through 18 of a transcript prepared by the government.

[starting on the 9th line of transcript page 17]

Powell:    Yo man.  See if you can get those shells for
           me – hit me up, rock my number ...[2]  Rock my
           number, man.  Bustin ... ... sayin' I'm gonna
           see soon with some hand tools too man.

---

[2]

Note: "..." designates unintelligible statements.

Peebles:    ...   This dude, he got a fuckin' gun permit
            outta Connecticut but I be - I be tryin' to
            find out when they got gun shows down there.
            You know, fuckin' ...

Powell:     Gun shows?

Peebles:    Yeah.  You gotta ... like they ... a Mass or
            whatever.  Whatever state you got a gun per -
            license in, if you go to the gun show and you
            don't have to register the guns that you -
            that you bought from the gun show, everybody
            -

Powell:     ...

Peebles     ... trades - you tradin' guns.

Powell:     Uh-uh.

Peebles:    ... you buy an ... you got a gun - you need a
            gun permit to get in.  But uhm - somebody got
            a gun permit -

Powell:     You could bring ... there and trade 'em in?
            But they're - they look at 'em and -

Peebles:    ...  I mean, the people that you're tradin'
            em with -
Powell:     No I'm sayin' they'd be like, oh, well , do
            you have a -

Peebles:    Mm-mm.

Powell:     So, he could just - I could give him the ...
            and be like, you, trade this in -

Peebles:    Yeah.

Powell:     ...  For real?

Peebles:    That's how like - when my cousins - when I
            had my gun permit with my cousins.  That's
            how we used to get 'em.  He Had a gun - he
            had a gun permit in Ohio and he'd go down and
            catch all the gun sales -

```
Powell:    ...

Peebles:   ... the gun shows.  My cousin – even I – when
           I had the gun ..., that's how I was gettin'
           'em.

Powell:    Not the ... with the afro, the one
           motherfuckers use to fuck with?

Peebles:   Nah, not ...  My cousin Cedric, he only came
           up like once a month.  Zip in and zip out.
           Drop off a bag of guns and ...

Powell:    So what's up with ...

[ending before the last 4 lines of page 18 of the
transcript]
```

The other portions of the conversation are irrelevant to the indictment and at times unduly prejudicial.  Those portions should be excluded pursuant to Fed.R.Evid. 402 and 403.

For example, on page 1 of the transcript Peebles tells Powell that "Duke got my – fuckin' got one of my burners too." That statement suggests that on October 23, 2003, a person named Duke may have had a gun which belonged to the defendant.  The indictment charges that the defendant was engaged in the business of dealing guns between October 30, 1999 and January 6, 2001.  Whether or not a man named Duke had a gun which belonged to the defendant in October 2003 is not relevant to whether the defendant was in the business of dealing guns from October 1999 to January 2001.

At page 6 of the transcript Peebles talks about his then pending Norfolk County indictment.  Peebles says "Yeah.  'Cause

when they uhm – ... the second – when I got indicted the second
time, that's when him and ... got indicted.  And I was like you,
... turn yourself in dawg, don't make me ... the nigga ... –"

At page 11 of the transcript, Peebles demonstrates his knowledge
of the inner workings of the Norfolk County and Suffolk County
jails.  Peebles continues to talk about his then pending Norfolk
County indictment onto page 12 of the transcript.  The fact that
Peebles was indicted in Norfolk County is prejudicial and/or is
not relevant to the pending indictment.

Respectfully Submitted,

JAMES PEEBLES,
By his Attorney:


_____
J. THOMAS KERNER
Attorney at Law
230 Commercial Street
First Floor
Boston, MA  02109
(617) 720-5509